**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Filed:

Index:

| | |
|---|---|
| YOSSEF KAHLON, | |

Plaintiff,

-against-

COUNTY OF NASSAU, JOHN/JANE DOE MEMBERS OF THE NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE, CELINE BOULBEN, and JOHN/JANE DOE "#METOO" ORGANIZATION(S),

Defendants.

**SUMMONS**

Plaintiff designates Nassau County as the place of trial

Basis of venue is the Residence of Plaintiff

**JURY TRIAL DEMANDED**

To the above-named Defendant(s):

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a Notice of Appearance, on the plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the state of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Garden City, New York
         February 28, 2024

**BARKET EPSTEIN KEARON ALDEA & LOTURCO, LLP**

By: _____
Bruce A. Barket, Esq.
Attorneys for Plaintiff
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 745-1500

1

Case 2:24-cv-02439-BMC    Document 1-2    Filed 04/01/24    Page 3 of 26 PageID #: 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

YOSSEF KAHLON,

                       Plaintiff,

     -against

COUNTY OF NASSAU, JOHN/JANE DOE MEMBERS
OF THE NASSAU COUNTY DISTRICT ATTORNEY'S
OFFICE, CELINE BOULBEN, and JOHN/JANE DOE
"#METOO" ORGANIZATION(S),

                    Defendants.

**COMPLAINT**

Docket:

**JURY TRIAL DEMANDED**

The Plaintiff, Yossef Kahlon, complaining of the Defendants through his attorneys at Barket Epstein Kearon Aldea & LoTurco, LLP, respectfully shows to this Court and alleges that for the reasons set forth below he was deprived of his civil rights and sustained injury as a result of this deprivation.

## INTRODUCTION

1.    The past several years have seen the "#MeToo" movement sweep across the country, from production studios to businesses to schools and to bedrooms. In many cases, actual sexual assault victims have been emboldened by the movement to stand up and name their abusers—offering a powerful step forward in the national conversation about sex, gender equality, and power. In a stubborn minority of cases, however, the movement has empowered accusers to convert sexual regret or opportunism into claims of sexual assault or rape—using the megaphone of #MeToo to cast consensual partners as predators, while ruining their targets' lives, careers, and reputations.

2.      When these false accusations are made to police or prosecutors, they cast law enforcement agents down a pathway of troubling incentive structures.  Even where evidence of consensual sex is clear, they have little to gain by turning away an alleged "victim" in favor of an accused sexual predator—and much to lose by way of public outrage.  In these false accusation cases, then, the incentive structure for certain prosecutors is to err on the side of bringing erroneous criminal charges even when doing so ignores the evidence and violates the rights of the accused.

3.      This case arises from an unfortunate but clear example of this incentive-structure phenomenon.  It involves a knowingly false accusation of rape made by a woman who met Mr. Kahlon on the Sugar daddy/Sugar baby dating website, Seeking.com, who admitted to the police that her qualm was over money rather than consent; a pressure campaign by lawyers and/or various organizations to have the worker treated as a #MeToo victim; and, ultimately, a relent by agents of the Nassau County District Attorney's Office, which, rather than face the pressure spawned by turning away this obviously hollow claim, conspired with the false accuser and her supporters to embellish the allegations well enough to ready them for showtime.

4.      Lying in the wake of these efforts is Yossef Kahlon, whose reputation was destroyed, and whose mugshot was widely disseminated by law enforcement press releases accusing him of being a rapist and seeking the names of other "victims."  In the aftermath of having been easily acquitted of the false charges lobbed against him, he brings the present civil rights action against those who conspired to pave over and bury his name on the way to joining the #MeToo movement.

## MUNICIPAL LAW OBLIGATIONS

5.      Yossef Kahlon was acquitted after trial on October 10, 2023.

Case 2:24-cv-02439-BMC    Document 1-2    Filed 04/01/24    Page 5 of 26 PageID #: 10

6.      Yossef Kahlon served a notice of claim on December 11, 2023.

7.      A 50-H examination of Yossef Kahlon was held on January 16, 2024.  The claim has not been settled or otherwise withdrawn.

## PARTIES

8.      Plaintiff, Yossef Kahlon, is a resident of Nassau County, New York, and was the subject of a series of constitutional violations and tortious conduct that forms the basis of this action.

9.      Defendant County of Nassau is a municipal entity in the State of New York, home to the Nassau County District Attorney's Office, which was the employer of Defendant(s), Assistant District Attorney(s) JOHN/JANE DOE, who, except as otherwise stated, was/were acting in the scope of his/her employment at all relevant times.

10.      Defendant JOHN/JANE DOE was/were at all relevant times an Assistant District Attorney(s) in the Nassau County District Attorney's Office acting under color of state law and, except as otherwise stated, in the scope of his/her employment.  He/She/They are sued here in his//her/their personal capacities.

11.      Defendant Celine Boulben upon information and belief is a resident of the County of New York, State of New York.

## STATEMENT OF FACTS

12.      Plaintiff, Yossef Kahlon (hereinafter, "Mr. Kahlon" or "Kahlon") met Celine Boulben (hereinafter, "Ms. Boulben" or "Boulben") on or about January 25, 2021 through a dating website called, SeekingArrangemnts.com, also known as Seeking.com, (hereinafter, "Seeking.com")

13.     Seeking.com was a so-called sugar-daddy/sugar-baby dating website that facilitated introductions of wealthy, usually older men to younger women in need of financial assistance.

14.     Boulben and Mr. Kahlon each were subscription-based, paying members of Seeking.com.

15.     Boulben initiated contact with Mr. Kahlon on January 19, 2021 by sending him a friendly message through the Seeking.com website in an effort to get him to notice and respond to her.

16.     Over the course of the next several days, Kahlon and Boulben exchanged a series of text messages and had a FaceTime conversation and agreed to meet.  They further agreed that Kahlon would send an Uber car, on his account and at his expense, on January 25, 2021 to pick up Boulben at a location she selected in Manhattan and drive her to his home located in Kings Point, New York.

17.     The Uber took Boulben to Mr. Kahlon's home around 3 p.m.

18.     He cooked her lunch of chicken and vegetables and they dined, had drinks, conversed, laughed, and got to know one another. After a couple of hours they agreed to go to the third level of his home to his bedroom.

19.     Prior to going to his bedroom, Boulben was encouraged to make herself at home and comfortable and walk around and see the rest of the home, which she did.

20.     Neither of them was intoxicated.

21.     When they arrived at Mr. Kahlon's bedroom, without prompting from him, Boulben asked him how much she was going to get paid for her time.  Mr. Kahlon responded to

her and told her not to worry, that she would receive payment whether they were intimate or not. Thereafter and without prompting, she began to undress and sat on the edge of his bed.

22.      Before any contact between the two of them, and without revealing their identities or faces, Mr. Kahlon showed Boulben photographs of other women he had been intimate with and depicted the nature of the sexual activities that were of interest to him, including dominant/submissive poses and activities. Boulben jokingly acknowledged his interest in such activities, and said she was willing to explore them with him.

23.      Over the course of next several hours Ms. Boulben and Mr. Kahlon engaged in numerous voluntary and consensual sexual activities, including sexual intercourse. During this period of time, Ms. Boulben never expressed a desire to discontinue their activities or to go home.

24.      Far from withholding consent, it was Ms. Boulben who initiated sexual intercourse, mounted Mr. Kahlon and had intercourse with him while she was on top of him.

25.      When they concluded intercourse, Mr. Kahlon arranged for Ms. Boulben to have a hot shower and got her fresh soaps, shampoo and a towel.

26.      During the course of Boulben's stay, Mr. Kahlon left Ms. Boulben's company several times, leaving her alone while he went to a different floor of his home.

27.      During all of these periods of time and throughout the six hours they were together, Boulben was free to leave at any time, including through an exit door of the home that sat just a few feet from where they were engaging in sexual activity.

28.      At no time did she attempt to leave and at no time did she ever indicate an inclination or desire to leave. Nor did she ever once indicate a desire to discontinue the sexual

activity in which they were engaged or in any way withdraw her consent to participate in such activities.

29.    Instead, despite Kahlon leaving the immediate area for a period of time, Boulben waited for him to return and they continued engaging in sexual activity.

30.    At approximately 9 p.m., after spending six hours at his home and after all sexual activity had come to an end, Mr. Kahlon invited her to stay longer or even spend the night, if she liked.  She declined and he made arrangements, once again, to call an Uber to take her back to her home in Manhattan.

31.    While no specific arrangement had been made or agreement reached as to how much money Boulben would receive from Mr. Kahlon for her time together with him, nor with an understanding if they would see each other again in the future, Mr. Kahlon gave Ms. Boulben $420.

32.    Ms. Boulben took the money, counted it and complained that it was not enough and that she was disappointed in his lack of generosity.

33.    He asked her how much more she was seeking.  She told him she usually gets anywhere between $800 and $1,500.

34.    He told her he didn't have any more cash.  She asked him if he could send her more on a cash app and ultimately gave him her real name (until then, she had only given him an alias), her address, the name of her bank, the bank's routing number, her checking account number and asked him to send her more money directly into her account.

35.    Mr. Kahlon kissed her on the cheek, put her safely in the Uber and returned to his home.

36.     During her time in Mr. Kahlon's house and during the ride back to Manhattan in the Uber, Boulben texted numerous friends and other clients/customers, engaging in a variety of light-hearted banter, and made no complaints or outcries of a problem of any sort, let alone rape.

37.     In fact, she texted a female friend, her designated "safety" friend who knew her whereabouts and nature of her intended activities with Mr. Kahlon, and assured her she was safely home with no hint of having had any kind of problem with Mr. Kahlon.

38.     Overnight and the following day, Boulben complained to various friends that she regretted spending nearly eight hours (including travel) with Mr. Kahlon, only to be compensated what she deemed an inadequate amount of money for her time.

39.     Friends of hers, including friends in France with whom she spoke in the next 24 hours, and who knew that she was, in part, a person who received cash payments from men in exchange for or otherwise after having sex with them, berated Mr. Kahlon to her, told her she was a crime victim and insisted she go to the hospital and to the police and report that she had been the victim of a crime.

40.     When at the insistence of her friends, she was seen by a medical care professional at CityMD Urgent Care in Manhattan the next day, and described her encounter with Mr. Kahlon, she never said she was raped and acknowledged when describing the dominant/submissive sexual activity she and Mr. Kahlon engaged in that she was not sure if she would even characterize any of it as a sexual assault.

41.     Her friends, knowing Mr. Kahlon was a wealthy man who lived in a mansion, encouraged her to file a police report in an effort to extort money from him, indicating that he would pay her because he would not want her allegation to go to a Court.

42.     When she went to make a police report the following day on January 27, 2021, she met with a Detective, Luis Salazar, for over an hour, which interview was recorded on video (the "Salazar Interview").

43.     During the Salazar Interview, Boulben never claimed she had been raped, admitted she went to Mr. Kahlon's house knowing she would be paid for her time and that she would probably have sex, admitted that she agreed to sex, that she was grossly disappointed that she was only paid $420, and admitted that she complained about the amount she had been paid by Mr. Kahlon and arranged to be paid even more.

44.     During the Salazar Interview, she further admitted that she had no intention of seeking either medical attention or filing a police report, but did so only after realizing that Mr. Kahlon sent her no further monies and her friends insisted that she do so, so that she could either extort him for more money or obtain a financial judgment against him if he was convicted of raping or sexually assaulting her.

45.     After listening to her account and asking Mr. Boulben if there were any other facts she wanted to relate, or any other relevant information or facts that were relevant to her complaint, Detective Salazar told her that he could not make an arrest or seek a search warrant based on the facts she had told him, including that:  She went to Mr. Kahlon's home expecting to have sex for money; that she agreed to participate in dominant/submissive activity with him after he showed her photos depicting the nature of the activities they were about to engage in,  that she consented to the sexual activity; that she expected to be compensated financially for her time; that she was disappointed in the amount of money she was paid, negotiated for more, gave her personal bank routing and account numbers and her real name to him; never withdrew her consent; never asked

to go home earlier than she did, some six hours after arriving at his home and never characterized the events of her date with Mr. Kahlon as rape.

46.     Initially, Detective Salazar told Ms. Boulben that there was no criminal charge that he could then bring against Mr. Kahlon and that unless additional evidence of rape or sexual crime was discovered, no arrest could be made.

47.     Subsequently, after leaving the interrogation room and consulting with another police officer, Detective Salazar returned to the room and told Ms. Boulben that if she would agree to participate in a so-called "controlled call" during which she would place a recorded call to Mr. Kahlon to be surveilled by the police, maybe he would admit committing some type of sexual crime against her.

48.     Knowing that such an enterprise would be unproductive and possibly even lead to proof of the false and/or exaggerated nature of her allegations, Boulben repeatedly refused to follow up or cooperate with Detective Salazar's investigation which he closed in a matter of weeks due to her lack of cooperation.

49.     Subsequently, Boulben investigated and consulted with various (presently John/Jane Doe) "#MeToo" victim's rights advocacy organizations, and consulted with and retained attorneys both to sue Mr. Kahlon and to pressure the Nassau County District Attorney's Office and the Nassau County Police Department to bring a criminal charges against him.

50.     In fact, two months after meeting with Detective Salazar and after her private retained attorneys waged a "#MeToo-style" campaign to pressure the Nassau Police Department and Nassau District Attorney's Office to make an arrest, and at the direction of the Nassau County District Attorney's Office and/or Nassau County Police Department, Ms. Boulben was invited

back to be interviewed by a different, this time, female detective, Detective Aileen Newbold (the "Newbold Interview").

51.     Detective Newbold conducted a lengthy second video-recorded interview about the very same events and allegations against Mr. Kahlon, differing only that having been coached by her #MeToo consultants and private lawyers, used the word rape for the very first time.

52.     Even Detective Newbold refused to make an arrest after interviewing Boulben, in spite of her power to do so, the same power that Detective Salazar refused to exercise.

53.     In or about May and/or June of 2021 Assistant District Attorney(s) John/Jane Doe was/were assigned to the investigation of Ms. Boulben's claims.   Rather than conducting him/herself as a prosecutor, ADA(s)  John/Jane Doe took on the role of an investigator, watched the two videotapes of Ms. Boulben's interviews and became immediately aware that she admitted that she had complained to Mr. Kahlon about the amount of money she received from him, told him what she expected to be paid, negotiated for more and gave him/her  her personal bank account information to facilitate a further payment.

54.     Recognizing that this information was damaging to her case and the effort to obtain an indictment against Mr. Kahlon, ADA(s) John/Jane Doe conspired with Ms. Boulben to alter her narrative of events and reduce or eliminate the exculpatory elements of her story, which she agreed to do.  And once he/she  secured this agreement he/she proceeded to put her into the grand jury to repeat the fabricated narrative.

55.     In fact, ADA(s) John/Jane Doe succeeded in this effort to deceive the Grand Jury convened in June of 2021, when he/she presented Ms. Boulben, who, according to script, failed to

acknowledge in her sworn testimony any such facts of her expressed dissatisfaction with the payment and efforts to be paid more money, other than that Mr. Kahlon had given her $420.

56.      ADA(s) John/Jane Doe was/were careful in his/her questioning of Ms. Boulben and made certain he/she asked her no questions which would elicit such facts and, in fact, moved onto different subjects immediately after Ms. Boulben testified that she had received the $420, thereby depriving the Grand Jury of this critical information which certainly would have caused them to refuse to indict Mr. Kahlon.

57.      As a consequence of ADA(s) John/Jane Doe conspiracy with Ms. Boulben, which was concocted before the grand jury was empaneled and while ADA(s) John/Jane Doe was/were still investigating the case, he/she obtained a six-count indictment charging Mr. Kahlon with Rape in the First Degree and five other felony sex crimes.

58.      ADA John/Jane Doe, in bad faith, defrauded the grand jury by intentionally manipulating the fact pattern presented to them and purposefully and deliberately hiding from them that Ms. Boulben had admitted that she expressed dissatisfaction with the amount of money she was paid, negotiated for a higher payment, and gave Mr. Kahlon all her banking information so that he might pay her more, and other exculpatory information tending to demonstrate the true nature of Boulben's brief relationship with Mr. Kahlon and her motivations for pressing charges.

59.      The Nassau County District Attorney and the Nassau County Police Department, after obtaining the referenced indictment, inexplicably waited an additional two months before making an attempt to arrest Mr. Kahlon, which eventually they did in August 2021.

60.      At or about the time of his arrest, the Nassau District Attorney's Office released a press release, announcing the indictment of Mr. Kahlon, featuring his photograph, home address,

suggesting that they were investigating whether there were other rape victims of Mr. Kahlon's either from the Seeking.com website or elsewhere and essentially inviting other "victims" of his to come forward, in spite of having no additional complaints or reason to believe that any such victims existed. The press release stated as follows: "The defendant allegedly brutalized a woman in his home and forced his victim to perform various sexual acts. If you believe you have been a victim of Yossef Kahlon, we urge you to call the Special Victims Bureau at (516) 571-1266 and report the incident" (the "Statement").

61.    As a consequence, Mr. Kahlon's name and face were splashed across newspaper headline after newspaper headline, including in Newsday and the New York Post, as well as across TV screens, including on multiple news cycles of New12 Long Island.

62.    In an instant, Mr. Kahlon's good name and reputation were ruined, and his life lay a smoldering wreckage. He was now an accused and indicted rapist and possibly a serial rapist at that.

63.    Every moment of the sexual encounter between Ms. Boulben and Mr. Kahlon was video-recorded on Mr. Kahlon's home video surveillance system.

64.    The referenced video would have proved the false nature of Ms. Boulben's claims and proved Mr. Kahlon's innocence.

65.    Both Detective Salazar and Detective Newbold knew this fact because Ms. Boulben told them so.

66.    No law enforcement official ever sought to interview Mr. Kahlon to hear his side of the story.

67.     No law enforcement official sought to obtain a copy of the exculpatory video they knew to exist.

68.     Mr. Kahlon hired the undersigned firm to defend him.

69.     Defense counsel confronted the Nassau County District Attorney's Office with all of the evidence of the false nature of Boulben's claims, Mr. Kahlon's innocence and the refusal of two high-ranking, highly experienced and highly respected Nassau County Police Department sex crimes detectives to make an arrest based upon all the evidence they had seen, as well as evidence of ADA(s) John/Jane Doe misconduct and unethical behavior in the Grand Jury.

70.     In October of 2023, Mr. Kahlon was brought to trial.

71.     Detective Luis Salazar, to his everlasting credit, flew in from Colorado for the trial, where he then resided, without even the necessity of being subpoenaed--and testified as a defense witness, as to the course of his investigation, why he refused to make an arrest, and why he did not have probable cause to make an arrest.

72.     Following the intervention of the #MeToo pressure campaign mounted by Ms. Boulben's private attorneys and #MeToo support organizations against the Nassau District Attorney's Office and the Nassau County Police Department, Detective Salazar was essentially removed from the case, replaced by Detective Newbold, who reached similar conclusions about the lack of credibility of Ms. Boulben's allegations, and just like Detective Salazar refused to arrest Mr. Kahlon.

73.     The pressure campaign continued metastasizing until it found an agent of law enforcement willing to succumb to it:  ADA(s) John/Jane Doe.

74.     Under ADA(s) John/Jane Doe direction, the Nassau District Attorney's Office took a highly unusual tactic of a direct grand jury presentation, knowingly presented a distorted and false version of the facts to manipulate and defraud the grand jury, who had they known about Ms. Boulben's fury upon being underpaid and efforts to get paid more money surely would have reached the same conclusion as had both Detectives Salazar and Newbold and returned a no-true bill, and declined to indict him.

75.     Seeking to avoid allegations of false arrest and hiding behind a belief that prosecutorial immunity would protect them if they made no arrest until after a grand jury returned an indictment, based on the manipulated and sanitized fact pattern with which they were presented, the Nassau District Attorney and ADA(s) John/Jane Doe abdicated their responsibilities to do justice and instead caved to the pressure from the #MeToo movement and Ms. Boulben's private attorneys and obtained an arrest warrant on the highly unusual, nearly unprecedented direct grand jury presentment in a rape case, also depriving Mr. Kahlon of the opportunity to be heard by the grand jury and defend himself.

## FIRST CAUSE OF ACTION:
## <u>FALSE ARREST (STATE LAW)</u>

76.     Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

77.     Defendant(s) ADA(s) John/Jane Doe was/were at all times acting under color of state law and in the scope of his employment.

78.     Defendant(s) ADA(s) John/Jane Doe intended to and did cause Mr. Kahlon's arrest and confinement.

79.     Defendant(s) ADA(s) John/Jane Doe was/were was  acting in an investigative rather than prosecutorial capacity.

80.     Mr. Kahlon was aware of his confinement and did not consent to it.

81.     The arrest and confinement of Mr. Kahlon was not supported by probable cause.

82.     The arrest and confinement of Mr. Kahlon was not otherwise privileged.

83.     The indictment of Mr. Kahlon was secured through perjury and fraud committed by Boulben and Defendant(s) ADA(s) John/Jane Doe in the grand jury, who planned and effectuated a campaign to withhold material exculpatory information from the grand jury and to falsify evidence relating to the charges.

84.     Mr. Kahlon suffered substantial damage from the false arrest as set forth below.

85.     Nassau County is liable for the false arrest of Mr. Kahlon under a theory of respondeat superior, as at all times, ADA(s) John/Jane Doe was/were acting within the scope of his/her employment, for the County's benefit and under its control.

### SECOND CAUSE OF ACTION:
### <u>FALSE ARREST (FEDERAL LAW)</u>

86.     Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

87.     Defendant(s) ADA(s) John/Jane Doe was/were at all times acting under color of state law and in the scope of his employment.

88.     Defendant(s) ADA(s) John/Jane Doe intended to and did cause Mr. Kahlon's arrest and confinement.

Case 2:24-cv-02439-BMC    Document 1-2    Filed 04/01/24    Page 18 of 26 PageID #: 23

89.     Defendant Boulben intended to and did cause Mr. Kahlon's arrest and confinement through the bad faith production of knowingly false and/or misleading information to the grand jury.

90.     Defendant John and Jane Doe #MeToo organizations intended to and did cause Mr. Kahlon's arrest and confinement through pressuring Boulben to make the bad faith production of knowingly false information to the grand jury.

91.     Defendant(s) ADA(s) John/Jane Doe was/were acting in an investigative rather than prosecutorial capacity.

92.     Mr. Kahlon was aware of his confinement and did not consent to it.

93.     The arrest and confinement of Mr. Kahlon was not supported by probable cause.

94.     The arrest and confinement of Mr. Kahlon was not otherwise privileged.

95.     The indictment of Mr. Kahlon was secured through perjury and fraud committed by Boulben and Defendant(s) ADA(s) John/Jane Doe in the grand jury, who planned and effectuated a campaign to withhold material exculpatory information from the grand jury and to falsify evidence relating to the charges.

96.     Mr. Kahlon suffered substantial damage from the false arrest as set forth below.

**THIRD CAUSE OF ACTION:**
**MALICIOUS PROSECUTION (STATE LAW)**

97.     Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

98.     Defendant(s) ADA(s) John/Jane Doe was/were at all times acting under color of state law and in the scope of his employment.

99.     Defendant(s) ADA(s) John/Jane Doe initiated criminal proceedings against Mr. Kahlon in Nassau County, where he was charged with rape.

100.    Defendant Boulben initiated criminal proceedings against Mr. Kahlon in Nassau County, where he was charged with rape, by furnishing knowingly false and misleading information to the grand jury.

101.    The criminal charges against Mr. Kahlon were terminated in his favor as he was acquitted after trial.

102.    The prosecution was not supported by probable cause that Mr. Kahlon had committed rape or any other criminal offense.

103.    The indictment was secured through perjury, bad faith and fraud committed by Defendant(s) ADA(s) John/Jane Doe and Boulben.

104.    Defendant(s) ADA(s) John/Jane Doe and Boulben acted during all relevant times with actual malice—prosecuting Mr. Kahlon without probable cause, and in the case of Defendant(s) ADA(s) John/Jane Doe, without the pursuit of justice, and instead to serve alternative goals including but not limited to furthering their careers and avoiding pressure from the #MeToo movement.

105.    Plaintiff Mr. Kahlon suffered substantial damage from the malicious prosecution as set forth below.

106.    Nassau County is liable for the malicious prosecution of Mr. Kahlon under a theory of respondeat superior, as at all times Defendant(s) ADA(s) John/Jane Doe was/were acting within the scope of his/her employment, for the County's benefit and under its control.

## FOURTH CAUSE OF ACTION:
## MALICIOUS PROSECUTION (FEDERAL LAW)

107.    Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

108.    Defendant(s) ADA(s) John/Jane Doe was at all times acting under color of state law and in the scope of his/her employment.

109.    Defendant(s) ADA(s) John/Jane Doe initiated criminal proceedings against Mr. Kahlon in Nassau County, where he was charged with rape.

110.    Defendant Boulben initiated criminal proceedings against Mr. Kahlon in Nassau County, where he was charged with rape, by furnishing knowingly false information to the grand jury.

111.    The criminal charges against Mr. Kahlon were terminated in his favor as he was acquitted after trial.

112.    The prosecution was not supported by probable cause that Mr. Kahlon had committed rape or any other criminal offense.

113.    The indictment was secured through perjury, bad faith and fraud committed by Defendant(s) ADA(s) John/Jane Doe and Boulben.

114.    Defendant(s) ADA(s) John/Jane Doe and Boulben acted during all relevant times with actual malice—prosecuting Mr. Kahlon without probable cause, without the pursuit of justice, and instead to serve alternative goals including but not limited to furthering their careers and avoiding pressure from the #MeToo movement.

115.     Plaintiff Mr. Kahlon suffered substantial damage from the malicious prosecution as set forth below.

## FIFTH CAUSE OF ACTION:
### MONELL

116.     Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

117.     Mr. Kahlon's constitutional rights were violated by an official policy and custom of Nassau County through the illegal official policies and customs of the Nassau County District Attorney's Office.

118.     The Nassau County District Attorney's Office has an official policy and custom of failing adequately to train its assistant district attorneys on the due process rules that are implicated upon interviewing witnesses or alleged victims for purposes of deciding whether to press charges.

119.     The Nassau County District Attorney's Office has an official policy and custom of failing adequately to discipline its assistant district attorneys for misconduct including, but not limited to, misconduct in interviewing witnesses or alleged victims.

120.     The Nassau County District Attorney's Office has an official policy and custom of failing adequately to discipline members of law enforcement accused of depriving the constitutional rights of Nassau County residents.

121.     The illegal policies and customs of the Nassau County District Attorney's Office gave rise to the misconduct perpetrated here by Defendant(s) ADA(s) John/Jane Doe, including his/her improper conduct in convincing Boulben to alter her narrative of events, embellish certain

Case 2:24-cv-02439-BMC    Document 1-2    Filed 04/01/24    Page 22 of 26 PageID #: 27

components of her story, eliminate others, and to fit her factual narrative to the targeted charge rather than measuring the charge against her factual narrative.

122. Policymakers in the County of Nassau know to a moral certainty that assistant district attorneys will regularly confront circumstances in which proper training and discipline concerning the limits of witness and victim interviews will be implicated.

123. Policymakers in the County of Nassau know to a moral certainty that assistant district attorneys will regularly confront circumstances in which these limits require a difficult decision of the sort that proper training would make less difficult.

124. Policymakers in the County of Nassau know to a moral certainty that assistant district attorneys who cross these limits will violate the due process rights of men and women facing criminal charges.

125. Defendant(s) ADA(s) John/Jane Doe violated Mr. Kahlon's due process rights by, among other things, pressuring and conspiring with Boulben to alter and embellish her narrative of events while withholding material exculpatory information.

126. Plaintiff Mr. Kahlon suffered substantial damage from the due process violations occasioned by the Nassau County official polices and customs as set forth below.

## SIXTH CAUSE OF ACTION:
### FABRICATION OF EVIDENCE (FEDERAL LAW)

127. Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

128. Defendant(s) ADA(s) John/Jane Doe was acting in an investigative capacity when he/she initially met with Boulben and convinced her to alter and embellish her narrative of events.

Case 2:24-cv-02439-BMC    Document 1-2    Filed 04/01/24    Page 23 of 26 PageID #: 28

129.    Defendant(s) ADA(s) John/Jane Doe knowingly procured a false and materially incomplete narrative from Boulben.

130.    The fabricated narrative was of the sort that was likely at the time to influence a jury's decision, as it reflected an alleged eyewitness account of criminality.

131.    Defendant(s) ADA(s) John/Jane Doe forwarded the fabricated narrative from Boulben to other members of the Nassau County District Attorney's Office.

132.    Mr. Kahlon suffered a deprivation of liberty as a result of the evidence-fabrication, including but not limited to his arrest, having to return to criminal court repeatedly pre-trial and at trial, and during the entire period of time from his arraignment through trial having to render himself amenable to the orders and processes of the Court.

133.    Mr. Kahlon suffered substantial damage from the fabrication of evidence, as set forth below.

## SEVENTH CAUSE OF ACTION:
## <u>CONSPIRACY</u>

134.    Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

135.    Defendant(s) ADA(s) John/Jane Doe, Boulben, and the John/Jane Doe #MeToo defendants entered into an agreement, before Boulben testified in the grand jury, to embellish the allegations against Mr. Kahlon, withhold material exculpatory information, and to tailor Boulben's allegations to what they viewed would be necessary to secure an indictment.

136.    Defendant(s) ADA(s) John/Jane Doe, Boulben, and the John/Jane Doe #MeToo defendants conspired to secure a false arrest of Mr. Kahlon.

137.    Defendant(s) ADA(s) John/Jane Doe, Boulben, and the John/Jane Doe #MeToo defendants conspired to secure a malicious prosecution of Mr. Kahlon.

138.    Defendant(s) ADA(s) John/Jane Doe, Boulben, and the John/Jane Doe #MeToo defendants conspired to fabricate evidence against Mr. Kahlon.

139.    Defendant(s) ADA(s) John/Jane Doe, Boulben and the John/Jane Doe #MeToo defendants succeeded in procuring Mr. Kahlon's false arrest and malicious prosecution.

140.    Mr. Kahlon suffered substantial damage from the conspiracy, as set forth below.

**EIGHTH CAUSE OF ACTION:**
**<u>NEGLIGENT HIRING, TRAINING AND RETENTION</u>**

141.    Plaintiff reiterates and reasserts all prior allegations in this Complaint as if set forth more fully again herein.

142.    On information and belief, Defendant(s) ADA(s) John/Jane Doe had a demonstrated propensity for engaging in improper conduct surrounding the gathering of evidence and prosecution of criminal cases.

143.    John and Jane Doe employees of Nassau County, inside the Nassau County District Attorney's Office, were in charge of hiring, training, and/or retaining Defendant(s) ADA(s) John/Jane Doe.

144.    Nassau County lacked appropriate screening mechanisms in reviewing and interviewing job applicants, which, if instituted, would filter out applicants with such propensities.

145.    Nassau County lacked appropriate disciplinary mechanisms to penalize prosecutors who engage in prosecutorial misconduct, which, if instituted, would deter the type of conduct that befell Mr. Kahlon.

146.    As a consequence of these hiring, training and disciplinary lapses, Defendant(s) ADA(s) John/Jane Doe and other County agents felt above the law with respect to their treatment of Mr. Kahlon and the charges that were manufactured against him.

147.    In the alternative to the allegations in the prior causes of action herein, Defendant(s) ADA(s) John/Jane Doe was/were acting outside the scope of his/her employment with the County in his/her decision to fabricate the case against Mr. Kahlon through manipulated evidence, but engaged in such behavior as a consequence of the hiring, training, disciplinary, and retention failures of the County.

148.    The damages that Mr. Kahlon sustained were a reasonably foreseeable consequence of the hiring, training, disciplinary, and retention lapses of the County.

149.    In failing to promote appropriate training, discipline, and retention practices, John and Jane Doe employees and agents of the County were at all relevant times acting with the County's assent, for its benefit and under its control, in the scope of their employment.

## DAMAGES

156.    As a consequence of the Defendants' conduct, Mr. Kahlon suffered substantial damages, including loss of liberty, emotional distress, damage to his reputation, attorneys' fees, and other pecuniary damages.

157.    The Defendants should be held liable not only to compensate Mr. Kahlon for his damages, but also to pay exemplary damages large enough to dissuade such egregious misconduct from taking place again in the future.

158.    The Defendants should be liable to pay attorneys' fees associated with this action as per the terms of 42 U.S.C. §1988(b).

INDEX NO. 603545/2024
RECEIVED NYSCEF: 02/28/2024

Case 2:24-cv-02439-BMC     Document 1-2     Filed 04/01/24     Page 26 of 26 PageID #: 31

**WHEREFORE**, Plaintiff prays for relief as follows:

A.    That the Court award compensatory damages to Plaintiff and against the defendants jointly and severally, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial that will deter such conduct by defendants in the future;

C.    That the Court award attorney's fees pursuant to 42 U.S.C. § 1988;

D.    For a trial by jury;

E.    For a pre-judgment and post-judgment interest and recovery of their costs; and

F.    For any and all other relief to which they may be entitled.

Dated: Garden City, New York
       February 28, 2024

**BARKET EPSTEIN KEARON ALDEA
& LOTURCO, LLP**

By: _____
       Bruce Barket, Esq.